CRAIG H. MISSAKIAN (CABN 125202)
United States Attorney
JEFF MITCHELL (CABN 236225)
Chief, Criminal Division
BENJAMIN J. WOLINSKY (CABN 305410)
Assistant United States Attorney

450 Golden Gate Avenue, Box 36055
San Francisco, California 94102-3495
Telephone: (415) 436-7200
FAX: (415) 436-7230
benjamin.wolinsky@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>EDWIN E. LICKISS, JR.,<br><br>Defendant. | CASE NO. 4:25-cr-00202-JST<br><br>UNITED STATES' SENTENCING MEMORANDUM<br><br>Dept.: Courtroom 6, 2nd Floor<br>Date: September 16, 2026<br>Time: 9:30 a.m. |

## INTRODUCTION

For nearly three decades, Edwin E. Lickiss, Jr. defrauded more than 93 victims of over $9.5 million. He did so by representing that he would invest their money in exclusive, tax-free bonds offering rates of return up to 30 percent. To lure victims into trusting him with their savings, Lickiss said that members of his own family had invested in the bonds, that he charged no investment fees because he had profited so substantially, and that investors could redeem their funds at any time. But the bonds did not exist. Instead, Lickiss operated a Ponzi scheme, using money from later investors to pay earlier investors while diverting substantial sums for his own use, including cash withdrawals, home renovations, travel, and payments on vehicles, mortgages, and personal credit cards.

Lickiss's fraud caused profound harm to his victims. Many are elderly, suffer from significant health conditions, or both. For these victims, the harm caused by Lickiss's decades-long fraud has upended the final years of their lives and, for some, thrown their spouses and children into financial precarity. The following examples illustrate only some of the harm Lickiss caused:

- **Exploited victims at their most vulnerable moments**. Victim ER wrote in her statement, "[my mother] was first drawn into his scheme in 1998, during one of the hardest periods of her life, while going through a divorce…He saw that vulnerability and exploited it without hesitation. Years later, after my father died from pancreatic cancer in 2018, I became one of his victims as well." (PSR ¶ 23)

- **Left victims unable to retire despite heart failure and cancer**. Victim MH wrote, "[w]e have lost a huge amount of our [hard-earned] income, over $600,000…My husband now feels he should work more at 74, with [congestive heart failure], bladder and prostate cancer..." (PSR ¶ 21)

- **Deprived victims of the ability to care for disabled family members.** Victim DB wrote, "I feel depressed and vulnerable that I cannot support my mentally challenged son with a special needs trust or care for my other son who has compromised ability to walk and be independent. I am reaching 89 years old this September…I wake up many nights scared…" (PSR ¶ 17)

The United States agrees with Probation that Lickiss has a Total Offense Level of 36 and a Criminal History Category of I, resulting in an advisory Guidelines range of 188 to 235 months in federal prison. The United States respectfully differs with Probation's recommendation of 72 months. That sentence would be 116 months below the Guidelines minimum, or around 62 percent below it. Such a sentence would give insufficient weight to the number of victims, the amount of loss, the nearly

three-decade duration of the scheme, and Lickiss's use of victim funds for personal expenses. Finally, a 72-month sentence would not adequately account for Lickiss's continued characterization of the money he took from victims as having been "borrowed." (PSR ¶ 28).

The United States therefore recommends a 108-month sentence. That sentence represents an 80-month downward variance, or nearly 43 percent below the bottom of the Guidelines range. Such a sentence would also fall within the range that the United States agreed to recommend under the plea agreement, which was 72 to 121 months. The United States also recommends that the Court order restitution in an amount of $12,159,828.18, order three years of supervised release, and impose a $200 special assessment.

## I. RELEVANT OFFENSE CONDUCT

### A. The Ponzi Scheme

Lickiss was a financial advisor in Danville and Alamo, California. PSR ¶ 7. He owned and operated Foundation Financial Group, a firm that provided investment services to individual investors in the Northern District of California, Idaho, and elsewhere in the United States. *Id.*

Beginning no later than 1998 and continuing through September 2024, Lickiss devised and carried out a scheme to defraud his investors. *Id.* ¶ 6. Lickiss told his victims that he would invest their money in exclusive (PSR ¶ 26), tax-free (PSR ¶ 9(a)) bonds that offered rates of return of up to 30 percent (PSR ¶ 10). Lickiss said that members of his own family had invested in the bonds (PSR ¶ 9(b)), that he charged no investment fees because he had profited so substantially (*id.*), and that investors could redeem their money at any time (*id.* ¶ 9(a)).

The bonds did not exist. *See* PSR ¶ 9(d). Rather, Lickiss funneled money from later victims to pay earlier investors, consistent with a Ponzi scheme. PSR ¶ 9(c)(iii). He also siphoned victim funds to pay his own personal expenses, including cash withdrawals, home renovations, travel, and payments on vehicles, mortgages, and personal credit cards. *Id.* ¶ 14.

To hide his scheme, Lickiss provided investors with fraudulent promissory notes on his firm's letterhead. *See id.* ¶ 9(c)(i). The notes purported to state the terms of the bond investments, including the claimed rates of return. *Id.* They also purported to track each investor's total investment. *Id.* The notes stated that any unpaid interest and principal would be paid from Lickiss's estate upon his death.

*See id.* ¶ 9(c)(ii). Lickiss stamped the notes with a medallion signature guarantee to make them appear legitimate. *Id.*

At times, Lickiss made "lulling" payments to investors and said that the payments were interest on the nonexistent bonds. PSR ¶ 9(c)(iii). He knew that the funds came from later investors, but used the money to pay earlier investors in the form of a Ponzi scheme. *Id.* Lickiss also persuaded investors to reinvest purported interest rather than demand payment. *Id.* ¶ 9(d). When investors sought payment, he gave false explanations for the delay. *Id.* He claimed, among other things, that a family member was ill, that a bank had withheld the funds, or that he was under audit.

Lickiss also concealed his regulatory history from investors. He did not disclose that FINRA had suspended him from association with any broker dealer in 2014. PSR ¶ 9(e). Nor did Lickiss disclose that he subsequently lost his broker's license in 2016. *Id.* He had a duty to disclose both facts. *Id.*

By 2024, the Ponzi scheme had collapsed. The next year, a grand jury indicted Lickiss on one count of wire fraud (18 U.S.C. § 1343) and one count of money laundering (18 U.S.C. § 1957). PSR ¶ 1. Lickiss pleaded guilty to both charges in May 2026. PSR ¶ 2. In doing so, he admitted to defrauding at least 93 victims of over $9.5 million. PSR ¶ 6.

### B. The Impact on Victims

Lickiss's fraud caused lasting harm to his victims. Many were elderly or suffering from significant health conditions when they entrusted him with their savings. The losses have forced some to delay retirement, continue working despite serious illness, or confront difficult choices about how to support their families. The victims' experiences also reveal a recurring pattern: Lickiss targeted people during periods of particular vulnerability or exploited longstanding relationships of trust:

- **Targeted victims during family deaths and personal health crises**. In her statement, Victim JC recounted that "[i]t was a few months after my mom had passed away of a prolonged illness from blood cancer….When I returned to the Bay area, my doctor discovered that I had a large tumor and I had to have major surgery to have it removed. It was at this exact time that this intentionally calculated scheme began. [Lickiss] knew that it was the lowest point of my life, both emotionally and physically…" PSR ¶ 19 (emphasis added).

- **Selected victims he had known since their childhood**. Victim PS wrote, "[w]hen I was young, he was involved in a relationship with my mother and became a father figure to me. Throughout the years, he repeatedly told me that he thought of me as a daughter. Because of that history, I trusted him completely. As a result of his actions, my husband and I now face a

> future that is dramatically different from the one we spent decades planning for…" PSR ¶ 24.

These accounts are not unique; rather, they reflect a broader pattern among Lickiss's victims. For example, Victim ER's mother first invested with Lickiss in 1998 while going through a divorce. Years later, after ER's father died of pancreatic cancer, ER also became a victim. PSR ¶ 23. Victim DB reported that she can no longer establish a special needs trust for her mentally challenged son or provide for another son with limited mobility. At 89 years old, she described waking at night afraid about her family's future. PSR ¶ 17.

Lickiss extended this pattern to his own family. Victim AL identified Lickiss as his uncle and a trusted family member, yet was preyed upon by Lickiss while caring for elderly family members. *See* PSR ¶ 35 ("[V]ictim AL, submitted that Mr. Lickiss was his uncle whom he viewed as a trusted family member and that Mr. Lickiss was aware of AL's state of vulnerability because AL was taking care of elderly family members…"). Victim AL described the Defendant's exploitation in depth at the victims' hearing on September 8, 2026.

Despite this pattern of targeting vulnerable people, Lickiss continues to characterize the money he took as having been "borrowed." *See* PSR ¶ 28 ("[Q.] Do you accept responsibility for committing the offense? If so, summarize your offense. [A.] Yes, I <u>borrowed</u> money on false pretenses…") (emphasis added); *see id*. ("[Q.] What influenced you to commit this offense? [A.] My misbegotten belief I could <u>borrow</u> the money, erase tax debts and quickly repay it…" (emphasis added)). His characterization contrasts with the experiences of his victims, who describe the money as having been taken through deceit and often bear the resulting psychological harm themselves. *See, e.g.*, PSR ¶ 19 (Victim JC wrote, "I believed that he had my best interests at heart. Now I feel like I was befriending the Devil. I feel naïve - Like the class dunce.").

The harm to Lickiss's victims was not limited to the loss of money. The pattern is clear: Lickiss exploited periods of vulnerability, relied on relationships built over decades, and left victims unable to pursue plans they had spent years building. The Court should account for this pattern and its consequences when assessing the seriousness of the offense and determining a sentence that is sufficient but not greater than necessary under 18 U.S.C. § 3553(a).

## II. GUIDELINES CALCULATION

The United States agrees with the Guidelines' calculation set forth by U.S. Probation in the final PSR. PSR ¶¶ 29 - 42. The calculation for the fraud and money laundering grouping, which determines Defendant's Guidelines, is set forth below:

| | |
|---|---|
| Base Offense Level, §§ 2S1.1(a)(1) and 2B1.1(a)(1): | +7 |
| Loss exceeding $9.5 million, § 2B1.1(b)(1)(K): | +20 |
| Substantial hardship >25 victims, § 2B1.1(b)(2)(C): | +6 |
| Violation of prior administrative order, §2B1.1(b)(9)(C): | +2 |
| Victim-related adjustment, §3A1.1(b)(1): | +2 |
| Abuse of position of trust, §3B1.3: | +2 |
| Adjusted Offense Level (subtotal): | 39 |
| Acceptance of Responsibility, §3E1.1(a): | -2 |
| Assisted authorities, §3E1.1(b): | -1 |
| **Total Offense Level:** | **36** |

Based on a Total Offense Level of 36 and a Criminal History Category of I, the advisory Guidelines range is 188 to 235 months of imprisonment. The United States agrees with this calculation. Although the Guidelines range is substantially higher than the sentence the United States recommends, the United States seeks a downward variance under 18 U.S.C. § 3553(a) to a sentence of 108 months.

## III. SENTENCING RECOMMENDATION

The overarching goal of a sentencing court is to impose a sentence that is sufficient to "reflect the seriousness of the offense, promote respect for the law, and provide just punishment; to afford adequate deterrence; to protect the public; and to provide the defendant with needed education or vocational training, medical care, or other correctional treatment." *United States v. Ressam*, 679 F.3d 1069, 1088-89 (9th Cir. 2012) (en banc); *see United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008); 18 U.S.C. § 3553(a). The Court should begin the sentencing process by correctly calculating the applicable Guidelines range and must "remain cognizant of them throughout the sentencing process." *Gall v. United States*, 552 U.S. 38, 50 n.6 (2007). In this case, the breadth of the defendant's misconduct and the substantial economic harm it caused is reflected in the advisory Guidelines range: 188-235 months. *See* PSR ¶ 75. That said, applying the Guidelines and considering all of the factors set forth in 18 U.S.C. § 3553(a), as fully set forth below, the United States respectfully recommends a sentence of 108 months.

**A. The Need to Afford Adequate Deterrence**

The defense may frame the defendant's age as a mitigating factor, but treating age as a basis for a further variance misapprehends the mechanics of large-scale financial fraud.

The entire premise of a Ponzi scheme lies in the perpetrator's belief that he can outlast detection, outlast market cycles, and outlast the legal system. Scale becomes a prerequisite to survival: more victims feed the engine, and more capital fuels the fraud.

To treat age as a basis for judicial leniency is to invert those economic incentives. It creates a moral hazard, signaling that a criminal can hedge their bets, scale up the fraud, and buy at least partial immunity through time. A further reduced sentence would, ironically, signal that maintaining a larger fraud for a longer period with more victims is not only morally equivalent—it is rational.

Furthermore, the recommended sentence already sits 43% below the bottom of the Guidelines range, meaning substantial leniency has already been applied to account for the humanitarian dimensions of the defendant's profile. Under 18 U.S.C. § 3553(a), the statutory calculus demands consistency, general deterrence, and proportionality, rather than systemic arbitrage driven by the offender's lifecycle.

Discounting a sentence further simply because a perpetrator grew older while executing a long-term scheme misallocates judicial discretion. Accountability cannot be outlived, and real, proportional consequences are required not only to address the harm suffered by the victims participating in these proceedings, but to ensure that future large-scale perpetrators understand that time is not an asset.

**B. The Nature and Circumstances of Lickiss's Offense**

Lickiss's misconduct is serious. For nearly three decades, he operated a fraudulent investment scheme that ultimately victimized at least 93 people and caused more than $9.5 million in losses. The duration, scope, and mechanics of the scheme distinguish this case from an isolated act of fraud or a single failed investment. Lickiss repeatedly induced victims to entrust him with their savings by making specific false representations about nonexistent bonds, the purported rates of return, the ability to redeem investments, and his own family's participation in the investments. PSR ¶¶ 6, 9-10.

Lickiss did not merely make false statements at the outset and then passively allow

an investment to fail. He actively maintained the fraud for decades. Lickiss generated fraudulent promissory notes, made lulling payments using money from later investors, encouraged victims to reinvest purported interest, and offered false explanations when victims sought their money. PSR ¶ 9(c)-(d). He also concealed his regulatory history, including his 2014 suspension from association with a broker-dealer and the loss of his broker's license in 2016. *Id.* ¶ 9(e).

The scheme was particularly harmful because Lickiss exploited relationships of trust and victims who were especially vulnerable. Some victims had known him for years or regarded him as a family member or father figure. Others entrusted him with their savings during periods of illness, bereavement, divorce, or other personal hardship. As the victim statements demonstrate, the consequences extended well beyond the financial losses themselves. Victims have described being unable to retire, continuing to work despite serious health conditions, being unable to provide for disabled family members, and experiencing significant emotional distress. *See* PSR ¶¶ 17, 19, 21, 23-24, 35.

The nature and circumstances of the offense therefore strongly support a substantial term of imprisonment. The Guidelines range of 188 to 235 months appropriately reflects the seriousness of the conduct, but the United States' recommendation of 108 months already accounts for the mitigating considerations warranting a substantial variance. A further reduction to 72 months would fail to give adequate weight to the extraordinary duration of the scheme, the number of victims, the amount of loss, the repeated acts of deception necessary to sustain the fraud, and Lickiss's use of victim funds for his own expenses.

### C. Lickiss's History and Characteristics

The Court should consider Lickiss's history and characteristics, but those considerations do not warrant the substantial additional reduction proposed by Probation. Lickiss has a Criminal History Category of I, and the United States has already accounted for his lack of significant criminal history in recommending a sentence substantially below the advisory Guidelines range.

At the same time, Lickiss's personal characteristics must be considered alongside the manner in which he has approached this offense. Most notably, even after admitting his criminal conduct, Lickiss has continued to characterize the money he obtained from victims as having been "borrowed." PSR ¶ 28. He described the offense as "borrow[ing] money on false pretenses" and stated that he acted on

a belief that he could "borrow the money, erase tax debts and quickly repay it…" *Id*. Those descriptions minimize the nature of what occurred. The victims did not knowingly "lend" Lickiss money. They trusted him based on misrepresentations about bonds that did not exist.

This characterization is particularly significant because Lickiss's conduct was not the product of a momentary lapse in judgment. He maintained the scheme for approximately 26 years, repeatedly deceived victims, generated documents designed to make the purported investments appear legitimate, and used funds from later investors to sustain the appearance that the investments were genuine. PSR ¶¶ 6, 9(c)-(d). His continued description of the conduct as borrowing therefore bears directly on the Court's assessment of his acceptance of responsibility and the need for a sentence that adequately addresses the seriousness of the offense.

**D. The Need to Reflect the Seriousness of the Offense, Promote Respect for the Law, and Provide Just Punishment for the Offense**

A sentence of 108 months is necessary to reflect the seriousness of Lickiss's offense, promote respect for the law, and provide just punishment. *See* 18 U.S.C. § 3553(a)(2)(A).

Lickiss spent nearly three decades violating the trust of people who believed they were placing their savings into legitimate investments. He did so on a massive scale, defrauding at least 93 victims of over $9.5 million. PSR ¶ 6. The scheme required sustained deception: Lickiss created fraudulent promissory notes, made payments to earlier investors with funds obtained from later investors, encouraged victims to reinvest purported interest, and repeatedly supplied false explanations when victims sought payment. PSR ¶ 9(c)-(d).

The losses were also not abstract. For many victims, the money represented years of savings and financial planning. Victim statements describe people who are elderly, seriously ill, or responsible for family members with significant needs. *See* PSR ¶¶ 17, 19, 21, 23-24. The consequences have included delayed retirement, continued employment despite serious illness, inability to provide for disabled family members, and substantial emotional distress.

A 72-month sentence would not adequately communicate the seriousness of this conduct. It would amount to a variance of 116 months below the bottom of the Guidelines range, around 62 percent below the 188-month bottom Guideline. Such a sentence would substantially discount the

extraordinary duration and scope of the fraud and the harm inflicted on its victims.

By contrast, the United States' recommendation of 108 months already represents a substantial variance. It is 80 months below the Guidelines minimum, or nearly 43 percent below it, and falls within the 72-to-121-month sentencing range contemplated by the parties' plea agreement. A 108-month sentence therefore provides meaningful consideration of the mitigating circumstances while still imposing punishment commensurate with the seriousness of the offense.

**E. The Need to Protect the Public From Future Crimes By Lickiss**

The Court should also consider the need to protect the public from further crimes by Lickiss. See 18 U.S.C. § 3553(a)(2)(C). Although Lickiss has no significant prior criminal history, his lack of a criminal record does not eliminate the need to consider the risk of future financial misconduct.

Lickiss demonstrated an extraordinary capacity to maintain a fraudulent scheme over an extended period of time. He obtained the trust of numerous investors, continued soliciting and accepting funds after the scheme had become dependent on new investor money, concealed the true nature of the investments through fraudulent documentation, and diverted victim funds to personal expenses. PSR ¶¶ 9, 14. The length of the scheme demonstrates that the conduct was not an isolated mistake but a sustained course of criminal behavior.

A 108-month sentence strikes the appropriate balance. It provides substantial protection for the public while recognizing that Lickiss does not have the extensive criminal history that would justify a sentence at the upper end of the Guidelines range.

**F. The Need to Avoid Unwarranted Sentencing Disparities**

Finally, the Court should consider the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct. *See* 18 U.S.C. § 3553(a)(6).

The United States's recommendation of 108 months appropriately accounts for this consideration. The advisory Guidelines range of 188 to 235 months reflects the seriousness of a fraud involving more than $9.5 million in losses, more than 25 victims suffering substantial hardship, a violation of a prior administrative order, a vulnerable-victim adjustment, and an abuse-of-trust adjustment. *See* PSR ¶¶ 29-42. Those enhancements distinguish this case from less serious

fraud offenses and provide an important benchmark against which to assess the appropriate sentence.

At the same time, the United States is not seeking a sentence within the advisory range. The recommended 108-month sentence represents an 80-month, nearly 43-percent downward variance from the bottom of the Guidelines range. It therefore considers the mitigating circumstances while maintaining proportionality with the seriousness of the offense.

A 72-month sentence would create a substantially greater departure from the Guidelines—116 months below the bottom of the range, or approximately 62 percent. Such a sentence would risk understating the significance of the factors that drove the Guidelines calculation, including the number of victims, substantial hardship to those victims, the amount of loss, the abuse of trust, and the duration of the fraud.

The United States' recommendation also falls within the 72-to-121-month range contemplated by the parties' plea agreement. Thus, 108 months represents a measured sentence: it is substantially below the advisory Guidelines range, within the sentencing range contemplated by the parties, and sufficiently severe to account for the distinctive seriousness of Lickiss's conduct without creating an unwarranted disparity.

**G. Additional Health Considerations**

Lickiss may seek a reduced sentence based on his claimed health conditions. The Court should consider any such arguments in context. Lickiss spent nearly a year delaying the resolution of this case based on his claim that a cognitive condition rendered him incompetent to proceed. That claim was ultimately rejected, and also brought to light of comments Lickiss made during a six-hour evaluation by the United States' retained psychiatrist, Vivek Datta. *See* U.S. Comp. Mem at 1 (Apr. 22, 2026) ("Comp Mem.").

During the examination, Lickiss articulately described the allegations against him as "the colloquial thing to say would be a Ponzi scheme," while explaining that he did not personally view the conduct that way. *Id.* at 6. Lickiss also repeatedly expressed his hope that Dr. Datta would find him incompetent because Lickiss believed that such a finding could result in dismissal of the case. *Id.* Dr. Datta observed that "[Mr. Lickiss] made it clear he hoped I would find him incompetent, which is atypical for those with dementia." *Id.* Dr. Datta further noted that Lickiss "was also able to repeatedly

intimate that he hoped he might be found not competent to stand trial" and concluded that "[n]one of this is consistent with severe memory impairment but rather indicates that he is able to assist in his defense." *Id.*

Any health conditions asserted by the defense should be supported by reliable evidence. At a minimum, previously untested medical claims or materials not shared with the United States should not support a variance.

## IV. RESTITUTION

The Mandatory Victims Restitution Act of 1996 (the "MVRA") provides that "when sentencing a defendant convicted of an offense described in [§ 3663A(c)], the court shall order . . . that the defendant make restitution to the victim of the offense." 18 U.S.C. § 3663A(a)(1). A "victim" is "a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered." *Id.* § 3663A(a)(2). The MVRA applies to cases of an offense resulting in damage to or loss or destruction of property of a victim. *Id.* § 3663A(b)(1). "In each order of restitution, the court shall order restitution to each victim in the full amount of each victim's losses as determined by the court and without consideration of the economic circumstances of the defendant." *Id.* § 3664(f)(1)(A). Any dispute as to the proper amount or type of restitution shall be resolved by the court by the preponderance of the evidence. *Id.* § 3664(e).

Here, the preponderance of evidence shows that investor-victims who provided victim impact statements suffered a loss of $12,159,828.18. This amount was fully foreseeable by Lickiss. The Court should order restitution as required by the MVRA. Alternatively, if the Court determines that the victims' losses are not fully ascertainable at this time, the United States requests that the Court postpone a final determination of the restitution amount for 90 days. *See* 18 U.S.C. § 3664(d)(5).

## V. CONCLUSION

For these reasons, the United States respectfully recommends that the Court sentence the defendant to 108 months in the custody of the Bureau of Prisons. The United States also recommends that the Court order restitution in an amount of $12,159,828.18, order three years of supervised release, and impose a $200 special assessment.

DATED: September 9, 2026

Respectfully submitted,

CRAIG H. MISSAKIAN
United States Attorney

*/s/ Benjamin J. Wolinsky*
BENJAMIN J. WOLINSKY
Assistant United States Attorney